[Cite as *State v. Hagaman*, 2026-Ohio-2888.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Maumee

    Appellee

v.

Steven Hagaman

    Appellant

Court of Appeals No. {48}L-25-00272

Trial Court No. 25 CRB 00082

**DECISION AND JUDGMENT**

Decided: July 28, 2026

* * * * *

Daniel C. Arnold, City of Maumee Prosecuting Attorney, for appellee.

Andrew R. Schuman, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Steven Hagaman, appeals the October 10, 2025 decision of the Maumee Municipal Court sentencing him following his conviction of criminal damaging. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} On June 20, 2024, a complaint charging Hagaman with criminal damaging in violation of R.C. 2909.06(A)(1), a second-degree misdemeanor, was filed in case No.

24CRB00500 ("case 500"). The complaint alleged that Hagaman "did create substantial physical harm to the victims [sic] property by striking his vehicle with his hands and feet, causing scratches and a dent."

{¶ 3} On June 27, 2024, Hagaman was served with the summons in case 500. On July 8, 2024, the day of his arraignment, Hagaman signed a written time waiver that "waive[d his] right to speedy trial in" case 500.

{¶ 4} On February 12, 2025, the City moved to dismiss case 500 without prejudice, which the trial court granted the same day.

{¶ 5} On February 18, 2025, an identical complaint was filed against Hagaman in case No. 25CRB00082 ("case 082"). Although a summons was issued on February 19, 2025, there is no evidence in the record that Hagaman was served with the summons in case 082. The summons set arraignment for March 3, 2025.

{¶ 6} The certified journal report for case 082 does not have an entry for March 3, 2025. However, on March 7, 2025, the journal notes that Hagaman's defense attorney entered an appearance, entered a not-guilty plea on Hagaman's behalf, and requested that the case be continued until March 26.

{¶ 7} On March 26, 2025, defense counsel filed a request for discovery. The record does not indicate that the City ever responded to Hagaman's discovery request.

{¶ 8} Also on March 26, the journal report indicates that Hagaman was present with his attorney, the case was continued to April 16, 2025, at defense counsel's request, and "Defendant waives time."

2.

{¶ 9} There is no journal entry for April 16, 2025. However, a journal entry for April 28, 2025, indicates that the case was continued to May 20, 2025, at defense counsel's request and "Defendant waives time."

{¶ 10} The journal entry for May 20, 2025, indicates that the case was continued to June 18, 2025, at defense counsel's request, "CASE RESCHEDULED PER" defense attorney, and "Defendant waives time."

{¶ 11} The journal entry for June 18, 2025, indicates that the case was continued to July 8, 2025, at defense counsel's request and "Defendant waives time."

{¶ 12} Although a pretrial was set for July 8, there is no journal entry from that date. However, there is a journal entry from July 15, 2025, which indicates that defense counsel requested that the case be set for a court trial, and the case was continued to August 27, 2025, at defense counsel's request.

{¶ 13} On August 27, 2025, Hagaman's case was tried to the court. At trial, the City presented the testimony of the victim, M.Z. Hagaman presented the testimony of his wife, Kiaya, and testified in his own behalf.

{¶ 14} M.Z. testified that he is personal injury attorney. The day of the incident, he went to Hagaman's home to deliver a letter related to a case. When Hagaman answered the door, M.Z. handed him the letter and started to explain what was in it. According to M.Z., Hagaman "grabbed it from [him], balled it up, threw it in [his] face, and said, I don't want your fucking letter. And then turned and slammed the door in [his] face." M.Z. was "stunned." He "thought for a second" and then knocked on the door

3.

again "thinking that possibly [he] could calm the situation and explain why [he] was there." Hagaman "opened the door quickly and started screaming at [M.Z.] immediately." He told M.Z. to get off of his property and if M.Z. did not get off of his property, he was going to get his gun. M.Z. thought that he saw a gun in the background. In response, M.Z. tried to explain that he was there to get insurance information, not to serve anything related to a lawsuit, but Hagaman "wouldn't have any of it" and started screaming again. M.Z. may have said something like, "if we file a case we're going to win," after which Hagaman "pushed out, he came out the door, he charged [M.Z.], and [M.Z.] backed up." After that, M.Z. may have asked if Hagaman's wife was home. M.Z. could see Hagaman's wife in the house but knew Hagaman "obviously wasn't going to bring her to the door to talk to [him]." At that point, M.Z. decided to "get in [his] car and leave because [he] felt threatened." M.Z. did not threaten Hagaman, brandish a weapon, or make any menacing gestures at any point during their interaction.

{¶ 15} About a minute after M.Z. got into his car, Hagaman "attacked the vehicle." As M.Z. explained it, "I sat in the car and then I started to pull out. I had—I had come in front ways and I backed up. And then I was facing and he was screaming at me. And I stopped the car. And at that point he went to the back of the car, my car door was shut, et cetera, and started kicking it in. . . . And then I left immediately."

{¶ 16} Once he got home and examined his car, he realized that there was damage to his vehicle. He got an estimate for repairs that totaled $1,323.60.

4.

{¶ 17} On cross-examination, M.Z. reaffirmed the sequence of events from the day of the incident; he knocked on the door, Hagaman answered, he handed Hagaman the letter, Hagaman balled it up and threw it in M.Z.'s face, Hagaman slammed the door, and then M.Z. reengaged with Hagaman by knocking on the door again. M.Z. confirmed that he saw Hagaman's wife inside the house. She came outside and yelled at Hagaman when he was kicking M.Z.'s car. M.Z. did not see any children in the house. M.Z. estimated that the entire interaction lasted about five minutes.

{¶ 18} M.Z. could not remember if he saw Hagaman with a firearm in his hand. He thought he saw Hagaman in the doorway with what looked like a gun in his hand but could not say for sure that was what he saw. He knew for sure that Hagaman referred to his gun.

{¶ 19} M.Z. denied recording any of the events on a phone or camera.

{¶ 20} M.Z. contacted the police about the event "[s]ometime within the next week," but did not contact them right away.

{¶ 21} He could not recall whether his window was up or down when he was in his car.

{¶ 22} Hagaman testified that he heard a knock on the door the day of the incident. He answered because his wife was busy. When he opened the door, M.Z. was standing there. He gave his name and, as Hagaman explained it,

> he immediately went into a case that I had no idea about, about my father-in-law. He even said, your father-in-law is guilty in a case that we are involved in. And then he tried to hand me some papers. And immediately I was kind of confronted. I had no idea about any of these

5.

things he's talking about. And I said, I don't want this, please leave my property, and I closed the door. . . . [B]efore I closed the door, he said, Here, take this, and he crumpled up his business card and threw it and it hit my son, who was sitting behind me.

{¶ 23} After Hagaman closed the door, he walked into the kitchen where his wife and two children were. The children were in their underwear. From the kitchen, Hagaman saw M.Z. with his phone pressed against the glass near the front door that looked into the kitchen. He believed that M.Z. was filming them, which "frustrated [him] a lot." So, Hagaman "went outside and I got into his nose and I said, You are—if I have to tell you to leave again, it will be with my gun. And then he gave me a grin. And I turned around and I walked back inside and I shut the door. And I immediately turned to look out the window to see if he was leaving, and he was." Hagaman took pictures of M.Z.'s car from his kitchen window.

{¶ 24} M.Z. was pulling out of the driveway toward the road but stopped, pulled out his phone, and "his arm was sticking out of the car and he was filming [Hagaman's] house again[.]" At that point, Hagaman went back outside. According to Hagaman,

he had his phone filming right at me and he said, You said you're going to go get a gun, guns are for killing people. And I looked right into the camera of his phone and said, You are a threat on my property refusing to leave. You are a danger to me and my family. I will absolutely go get a gun. And he gave me a big grin, and I said, Leave, three more times to his face, and he just kept smiling. So I walked to the back of his car and punched it three times. My wife yelled my name and then I—as soon as I heard her, I walked back to my house, and he drove away.

{¶ 25} After calming down for several minutes, Hagaman called the police.

{¶ 26} On cross-examination, when the prosecutor asked if M.Z. made any threats to Hagaman, Hagaman responded, "I asked him to leave my property at least seven times,

6.

and all of them were refusals to leave. That is a threat to me in my eyes, especially when I have small children[,]" and "He got in my face and gave me a grin. To me that is a threat." He also characterized "[f]ilming me and my family and my children in their underwear [a]s very threatening to [him]."

{¶ 27} Hagaman agreed that the entire interaction lasted five minutes or less.

{¶ 28} Hagaman did not call the police while the threat was ongoing because when "[t]here's a threat and a danger to my property, I don't have time to call the police, I have to deal with the threat." Although Hagaman thought that the police were going to file trespassing charges against M.Z., as far as he was aware, no charges were ever filed against M.Z. related to this incident.

{¶ 29} On redirect, Hagaman reiterated that M.Z. had parked his car and started filming again before Hagaman punched the car, which got M.Z. to leave the property.

{¶ 30} Kiaya testified that she heard a knock on the door the day of the incident. She asked Hagaman to address it because she was bathing their children. She could not hear exactly what was going on, but "could hear there was tension between them" and heard Hagaman asking M.Z. to go. When she got to the kitchen, she could see M.Z. through the window. He was going to his car. Hagaman went out to tell M.Z. to leave, and Kiaya heard him say something about a gun. When Hagaman came back in the house, she told Hagaman, "We don't need the gun, he will leave." At that point, Hagaman "went back out there and said, You need to leave, you need to leave, you need to leave. [M.Z.] was still in the driveway in his car, I'm assuming filming, had his phone

7.

out the window pointed in my husband's face. My husband punched the car several times and then [M.Z.] eventually did leave."

{¶ 31} Kiaya explained that she had seen M.Z.'s cellphone earlier when she was in the kitchen. M.Z. was looking through the window, and she could see his phone against the window.

{¶ 32} On cross, Kiaya testified that she was yelling at Hagaman to stop as he was punching M.Z.'s car. When the prosecutor asked if she thought it was not a good idea for Hagaman to be hitting the car, she responded, "I think he was doing what he necessarily needed to do to get [M.Z.] off the property. I don't think [M.Z. was] taking his several verbal warnings." She agreed that she did not "think the continuing to do it" was a good idea because she thought that "he got his point across."

{¶ 33} Kiaya would not characterize Hagaman as irate; instead, she claimed he was "unsettled about the situation."

{¶ 34} After hearing the evidence, the trial court found Hagaman guilty. In reaching its decision, the court found that Hagaman did not produce evidence that he was entitled to claim self-defense. It also stated that it "question[ed]" Hagaman's testimony and found M.Z.'s testimony credible. The court concluded that "[t]he long and the short of it, though, is you've got a car that's driving away, whether it's paused or not, that got kicked. There's no self-defense there."

{¶ 35} At the sentencing hearing, defense counsel—who was a different attorney than the one who represented Hagaman at trial—noted for the record that the City did not

8.

provide video or audio recordings in discovery, which he represented that the City would admit to. The prosecutor later agreed that the City had not provided recordings in discovery. Counsel also noted that Hagaman wanted a jury trial and had asked his former attorney about one "repeatedly."

{¶ 36} Defense counsel addressed the court first. After he finished his mitigation speech, counsel asked if he could inquire of Hagaman, which the court allowed. Counsel asked Hagaman whether he had "repeatedly" requested a jury trial from his prior attorney, to which Hagaman responded, "Yes," and whether his prior attorney had respected his request for a jury trial, to which Hagaman responded, "No." Counsel introduced a text message that Hagaman sent his prior attorney after trial in which he noted that he had asked for a jury trial but ended up with a bench trial.

{¶ 37} When counsel finished questioning Hagaman, the court asked Hagaman, "Sir, is there anything you'd like to say in mitigation?" Hagaman declined to speak.

{¶ 38} After that, the trial court imposed sentence. It sentenced Hagaman to 90 days in jail with 60 suspended and the remaining 30 to be served on electronic home monitoring, a $750 fine with $650 suspended, costs, restitution to M.Z. of $1,323.60, and two years of probation.

{¶ 39} Hagaman now appeals, raising five assignments of error.

    1. The verdict is against the manifest weight of the evidence.

    2. The court failed to properly sentence Mr. Hagaman.

    3. Mr. Hagaman's speedy trial rights were violated.

    4. Trial counsel was ineffective.

9.

5. The court lacked personal jurisdiction.

## II. Law and Analysis

### A. The trial court had personal jurisdiction over Hagaman.

{¶ 40} In his fifth assignment of error, Hagaman argues that the trial court lacked personal jurisdiction over him in case 082 because there was no probable-cause finding, the summons was never served on him, he never entered a plea, and he was never arraigned. He also contends that his appearance before the court was not voluntary because he knew that the court would issue a warrant for his arrest if he failed to appear. The City responds that Hagaman waived the personal jurisdiction argument that he is raising for the first time on appeal by appearing at pretrials, hiring counsel to defend him, and appearing and testifying at trial—all without objecting to the trial court's jurisdiction.

{¶ 41} Personal jurisdiction is the court's power to render a valid judgment against a particular individual. *State v. Henderson*, 2020-Ohio-4784, ¶ 36. In a criminal case, a court acquires jurisdiction over a person by lawfully issued process, arrest and arraignment of the accused, and his plea to the charge. *Id.*, citing *Tari v. State*, 117 Ohio St. 481, 490 (1927). A defendant also submits to the court's jurisdiction if he does not object to the court's exercise of jurisdiction over him. *Id.*, citing *Tari* at 491. By submitting to the court's jurisdiction, the defendant waives his challenge to the court's personal jurisdiction. *See State v. Mbodji*, 2011-Ohio-2880, ¶ 10, citing *State v. Holbert*, 38 Ohio St.2d 113, 118 (1974).

{¶ 42} Here, although proper service of process and arraignment appear to be missing from case 082, we nevertheless find that the trial court had personal jurisdiction

10.

over Hagaman. Hagaman submitted himself to the trial court's jurisdiction by failing to object—at any point before or after trial—to the court's exercise of jurisdiction over him. *Henderson* at ¶ 36. And by submitting himself to the court's jurisdiction, Hagaman waived his challenge to the trial court's exercise of personal jurisdiction over him. *See Mbodji* at ¶ 10. Because Hagaman has waived his challenge to personal jurisdiction, we find that his fifth assignment of error is not well-taken.

### B. Hagaman's speedy trial rights were not violated.

{¶ 43} In his third assignment of error, Hagaman argues that his statutory speedy trial right was violated because the City failed to bring him to trial within 90 days of service of summons. The City responds that Hagaman did not raise this issue in the trial court, so we can review it only for plain error, and the record does not show that Hagaman was brought to trial outside of the statutory deadline.

{¶ 44} The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10, of the Ohio Constitution. *State v. Adams*, 43 Ohio St.3d 67, 68 (1989). The Ohio legislature adopted the provisions of R.C. 2945.71 to 2945.73 to implement these constitutional guarantees. *Id.*

{¶ 45} The prosecution is required to bring a defendant charged with a second-degree misdemeanor to trial within 90 days after the person's arrest or service of summons. R.C. 2945.71(B)(2). The statute is mandatory, and the prosecution must strictly comply with its requirements. *State v. Hohenberger*, 2010-Ohio-4053, ¶ 35 (6th Dist.). Speedy trial time starts the day after the defendant is served with a summons.

11.

*State v. Wood*, 2024-Ohio-5597, ¶ 27 (2d Dist.). If the defendant does not receive service of summons, the first day chargeable to the state is the day of the defendant's initial appearance before the court. *Glass v. Franklin Cty. Dept. of Animal Care & Control*, 2023-Ohio-4804, ¶ 25 (10th Dist.), citing *State v. Pritchard*, 2013-Ohio-1255, ¶ 9 (10th Dist.).

{¶ 46} Certain events, such as the defendant filing a motion or requesting a continuance, can extend the time for trial. R.C. 2945.72(E), (H). Speedy trial time is tolled during the period between the dismissal of charges and the subsequent refiling of new charges based upon the same underlying facts as the original charges unless the defendant is held in jail or released on bail. *State v. Baumgartner*, 2004-Ohio-3907, ¶ 21 (6th Dist.), citing *State v. Broughton*, 62 Ohio St.3d 253 (1991), paragraph one of the syllabus. Time is also tolled while the prosecution is responding to the defendant's discovery request. *Sylvania v. Murray*, 2015-Ohio-5023, ¶ 9 (6th Dist.), citing *State v. Brown*, 2002-Ohio-7040, syllabus. If the record does not reflect when the prosecution responded to the discovery request, time is tolled for a reasonable period, which is generally 30 days. *Id.* at ¶ 13.

{¶ 47} When a defendant makes a prima facie showing that his speedy trial time has elapsed, the burden shifts to the prosecution to demonstrate that the defendant was timely brought to trial. *State v. Taylor*, 2001 WL 1198648, *2 (6th Dist. Oct. 5, 2001). If the prosecution fails to do so, the court is required to dismiss the charges against the defendant. R.C. 2945.73(B).

12.

{¶ 48} Under R.C. 2945.73(B), an accused is required to make a motion to dismiss based on a speedy-trial violation "at or prior to the commencement of trial[.]" If he fails to do so, we review his speedy-trial claim only for plain error. *State v. Hall*, 2022-Ohio-3501, ¶ 12 (6th Dist.). Plain error is an error that affects substantial rights. Crim.R. 52(B). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92 Ohio St.3d 191, 203 (2001), citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 49} Here, we find no plain error related to Hagaman's statutory speedy-trial right. Although Hagaman was tried 425 days after service of summons in case 500, the trial court's journal shows that all but 19 of those days were tolled:

| Dates | Speedy-trial days | Reasoning |
|---|---|---|
| June 28 to July 8, 2024 | 10 | Service of summons to signing of time waiver in case 500 |
| July 9, 2024, to February 12, 2025 | Tolled | Signing of time waiver to dismissal of case 500 |
| February 13 to 17, 2025 | Tolled | Time between dismissal of charge in case 500 and refiling of charge in case 082 |
| February 18 to March 26, 2025 | Tolled | Time between refiling of charge and clock restarting with Hagaman's initial appearance in case 082 |
| March 27 to April 26, 2025 | Tolled | Reasonable time for City to respond to Hagaman's discovery request |
| April 27 to 28, 2025 | 2 | Time unaccounted for between pretrials |

13.

| | | |
|---|---|---|
| April 29 to May 20, 2025 | Tolled | Continuance at Hagaman's request |
| May 21 to June 18, 2025 | Tolled | Continuance at Hagaman's request |
| June 19 to July 8, 2025 | Tolled | Continuance at Hagaman's request |
| July 9 to July 15, 2025 | 7 | Time unaccounted for between pretrials |
| July 16 to August 27, 2025 | Tolled | Continuance at Hagaman's request |

**Total days: 19**

{¶ 50} Thus, because only 19 days of chargeable time elapsed from the filing of case 500 to Hagaman's trial date, his statutory speedy-trial right was not violated, and he is not entitled to have his case dismissed.

{¶ 51} To the extent that Hagaman raises an argument related to his constitutional right to a speedy trial, he bases it entirely on the incorrect premise that "there is no entry of dismissal in [case 500]. Seemingly speedy trial time is still running. Although there was a time waiver in that case, there is a constitutional speedy trial violation because an unlimited time waiver could never have anticipated the court keeping the case pending forever." The trial court did, however, file a judgment entry dismissing case 500 on February 12, 2025, so the case is not still pending, and speedy-trial time is not still running. We find Hagaman's constitutional arguments without merit. Hagaman's third assignment of error is not well-taken.

14.

## C. The verdict is supported by the weight of the evidence.

{¶ 52} In his first assignment of error, Hagaman argues that the trial court's verdict is against the manifest weight of the evidence because the City failed to disprove any of the elements of self-defense beyond a reasonable doubt. He contends that he had no duty to retreat, was not at fault in causing the affray, was clearly in fear and perceived M.Z.'s conduct as a threat to his family, and felt sufficiently threatened to use force in self-defense. The City responds that the trial court was in the best position to determine if M.Z. did or did not record Hagaman and his family and, if recording happened, whether that conduct rose to the level of creating an imminent threat of bodily harm. Regardless, the City argues that M.Z. had removed himself from the confrontation by getting in his car and attempting to leave Hagaman's house before Hagaman punched M.Z.'s car, "negating [Hagaman's] argument that he had both an objective and reasonably subjective fear that he was in danger of imminent harm."

{¶ 53} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *Thompkins* at

15.

387.  Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'"  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175 (1st Dist. 1983).

{¶ 54} "When reviewing a manifest weight claim involving self-defense, the court reviews the entire record, considers the credibility of witnesses, and determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the State disproved at least one of the self-defense elements beyond a reasonable doubt."  *State v. Weemes*, 2025-Ohio-2319, ¶ 33 (6th Dist.).

{¶ 55} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor.  *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.); *State v. Reillo*, 2026-Ohio-2701, ¶ 32.

{¶ 56} To support a claim of self-defense involving the use of non-deadly force, a defendant must show that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had reasonable grounds to believe or an honest belief that he was in imminent danger of bodily harm, and (3) he did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm.  *State v. Greer*, 2023-Ohio-103, ¶ 33 (6th Dist.).  Once the defendant presents a viable self-defense claim, the

16.

prosecution must disprove one of the elements beyond a reasonable doubt to defeat the claim. *Weemes* at ¶ 32.

{¶ 57} In this case, the trial court did not lose its way or create a manifest miscarriage of justice by finding that Hagaman failed to present evidence tending to prove a self-defense claim. There was absolutely no evidence presented at the trial that Hagaman thought that he was in danger of bodily harm from M.Z. Assuming that all of Hagaman's testimony is true and M.Z. did, in fact, record Hagaman and his family, although Hagaman testified that he found M.Z.'s recording of his family to be a "threat," he never said that he was concerned for his safety, that he thought M.Z. was going to physically hurt him, or anything similar. Nor can danger of bodily harm be inferred from M.Z.'s actions while recording because M.Z. was outside of Hagaman's house while Hagaman and his family were inside and M.Z. never came physically near to Hagaman while he was recording. Without some evidence of imminent danger of bodily harm, Hagaman failed to present a viable case of self-defense. Therefore, the trial court's verdict is not against the manifest weight of the evidence, and Hagaman's first assignment of error is not well-taken.

### D. The trial court complied with Crim.R. 32(A)(1), and its failure to fully comply with Crim.R. 32(A)(2) and (3) was not prejudicial.

{¶ 58} In his second assignment of error, Hagaman argues that the trial court erred by failing to comply with Crim.R. 32(A) during his sentencing hearing. Specifically, he contends that the court erred by (1) asking Hagaman, "is there anything you'd like to say in mitigation?" instead of using the exact phrasing of the rule and asking Hagaman "if he

17.

or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment"; (2) failing to ask the prosecutor if he wanted to address the court; and (3) failing to advise the victim of his rights under the law. The City responds that the trial court offered Hagaman the opportunity to speak, which he declined to do, and Hagaman cannot show that he was prejudiced by the trial court's failure to offer the prosecutor and the victim the opportunity to speak.

{¶ 59} Criminal Rule 32 requires a trial court to do a number of things at a defendant's sentencing hearing, including "address[ing] the defendant personally and ask[ing] if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment"; "[a]fford[ing] the prosecuting attorney an opportunity to speak" at the time of sentencing; and "[a]fford[ing] the victim the rights provided by law[.]" Crim.R. 32(A)(1)-(3).

{¶ 60} Regarding the first part of the rule, there is no requirement that the trial court recite Crim.R. 32(A)(1) verbatim as long as it is clear from the record that the court personally addressed the defendant and gave both the defendant and his attorney the opportunity to speak. *See State v. Crable*, 2004-Ohio-6812, ¶ 16-20 (7th Dist.). Here, the trial court clearly asked Hagaman if there was anything he wanted to say in mitigation. Hagaman declined to speak. That is all that is required by Crim.R. 32(A)(1). The trial court did not err by failing to recite the rule verbatim.

{¶ 61} Regarding the other parts of the rule, Hagaman cannot show that the trial court's failure to comply with them prejudiced him, making the errors harmless. Crim.R.

18.

52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights ..." is harmless and "shall be disregarded.").  Hagaman does not attempt to argue that the trial court's failure to allow the prosecutor to speak and to afford M.Z. his rights under the law somehow impacted *Hagaman's* substantial rights.  Without that showing, we cannot say that Hagaman was prejudiced by the court's failure to comply with Crim.R. 32(A)(2) and (3), and the trial court's errors were therefore harmless.  *State v. Dudley*, 2025-Ohio-1715, ¶ 15 (6th Dist.).  Hagaman's second assignment of error is not well-taken.

### E. Hagaman received effective assistance of counsel.

{¶ 62} Finally, in his fourth assignment of error, Hagaman argues that he received ineffective assistance of trial counsel because counsel failed to (1) raise the speedy-trial issue in the trial court, which would have resulted in dismissal of the case; (2) abide by Hagaman's desire for a jury trial, which violated the Rules of Professional Conduct; (3) obtain body camera footage in discovery, which could have resulted in the discovery of exculpatory evidence; and (4) object to the trial court's lack of personal jurisdiction over Hagaman.  The City responds that trial counsel's decision to proceed to trial without raising the speedy-trial issue was an issue of trial strategy that does not amount to ineffective assistance.  It also contends that there is no evidence in the record, beyond Hagaman's posttrial claims, that Hagaman requested a jury trial instead of a bench trial.  Finally, the City argues that counsel's decision not to obtain body camera video was trial strategy, not ineffective assistance.

19.

{¶ 63} To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). Failure to present sufficient evidence on either prong is fatal to an ineffective-assistance claim. *State v. Leasure*, 2023-Ohio-2710, ¶ 40 (6th Dist.), citing *Strickland* at 697.

{¶ 64} To prevail on an ineffective-assistance claim, the defendant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland* at 686. Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case. *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *Bradley* at 142. Thus, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Bradley* at 142, quoting *Strickland* at 689. "[E]ffective assistance of counsel does not equate with a winning defense strategy . . . ." *State v. Strickland*, 2003-Ohio-491, ¶ 16 (6th Dist.).

{¶ 65} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the

20.

challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 2009-Ohio-2603, ¶ 22 (6th Dist.).

{¶ 66} Here, Hagaman has not shown that he received ineffective assistance of counsel. First, we have already determined that there was no speedy-trial violation, so trial counsel filing a motion to dismiss based on speedy-trial time would not have resulted in the case against Hagaman being dismissed. Counsel's failure to file such a motion did not fall below an objective standard of reasonable representation.

{¶ 67} Next, Hagaman has not shown that he was prejudiced by trial counsel's alleged failure to abide by his desire for a jury trial rather than a bench trial. The test for prejudice in the ineffective assistance context is whether there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *Hale*, 2008-Ohio-3426, at ¶ 204. A defendant is not automatically prejudiced by counsel's failure to secure a jury trial for the defendant. *See Akron v. Fitzgerald*, 2005-Ohio-2411, ¶ 13 (9th Dist.) (In arguing that his counsel was ineffective, defendant "merely argued that he could have had a jury trial had his counsel filed a demand notice. Although this is a correct statement of the law, such a contention fails to establish prejudice."); *Cleveland v. Hopkins*, 2012-Ohio-5170, ¶ 14 (8th Dist.) (finding no merit to an ineffective assistance of counsel claim where the defendant failed to "demonstrate how the decision to have a bench trial resulted in prejudice to him"); *State v. Holtman*,

21.

2019-Ohio-3052, ¶ 46 (12th Dist.) ("[A]ssuming, arguendo, that the failure to file a jury demand in the present case was the result of professional negligence, appellant has not demonstrated prejudice as a result thereof, thereby precluding a finding of ineffective assistance."). Hagaman has not presented any evidence that the outcome of this case would have been different if he had gone to trial before a jury instead of before the court. Because Hagaman has not done so, he cannot show that his trial counsel provided ineffective assistance related to the type of trial he received. *See Fitzgerald* at ¶ 13; *Hopkins* at ¶ 14; *Holtman* at ¶ 46.

{¶ 68} Similarly, Hagaman has not provided any evidence that the outcome would have been different if trial counsel had obtained body camera footage in discovery. Without some showing that there is a reasonable probability that the result of the proceeding would have been different, Hagaman cannot show that he was prejudiced by counsel's actions related to discovery.

{¶ 69} Finally, regarding trial counsel's failure to object to the trial court's lack of personal jurisdiction over Hagaman, we again find a lack of prejudice. A court obtains jurisdiction over a person through service of summons, arraignment, and entering of a plea. *Henderson*, 2020-Ohio-4784, at ¶ 36. It is likely that the City, if put on notice of the lack of service of summons by counsel objecting to the court's personal jurisdiction or filing a motion to dismiss, would have cured the jurisdictional deficiency by serving Hagaman with the summons and bringing the lack of arraignment to the trial court's

22.

attention. Thus, it is unlikely that the outcome of the proceedings would have changed if trial counsel had objected to the trial court's lack of personal jurisdiction over Hagaman.

{¶ 70} Because we have found that Hagaman has failed to prove ineffective assistance of counsel, his fourth assignment of error is not well-taken.

### III. Conclusion

{¶ 71} Based on the foregoing, the October 10, 2025 decision of the Maumee Municipal Court is affirmed. Hagaman is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Christine E. Mayle, J.

_____
JUDGE

Myron C. Duhart, J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.